# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| In Re: ) | Case No.: 19-80014-tlp11 |
| ) | Affiliated Cases: 19-80013-tlp11 & 19-80015-tlp11 |
| **JONES LEASE PROPERTIES, LLC** ) | |
| ) | |
| Debtor and Debtor in Possession. ) | Chapter 11 |
| ) | |
| P.O. Box 132 ) | Hon. Thomas L. Perkins |
| Colona, IL 61241 ) | |
| ) | |
| EIN: 33-1090280 ) | **QUAD CITY BANK AND TRUST COMPANY'S OBJECTIONS TO DEBTOR'S DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION DATED MAY 31, 2019** |

Creditor, Quad City Bank and Trust Company ("QCBT"), by and through its attorneys, Lane & Waterman LLP, hereby submits the following legal objections ("Objections") to the Debtor's Disclosure Statement (the Disclosure Statement") and Plan of Reorganization (the "Plan") dated May 31, 2019, filed by Jones Lease Properties, LLC (the "Debtor") in the above captioned matter. To the extent any objection to the Disclosure Statement, in whole or in part, contained herein is deemed to be an objection to confirmation of the Plan rather than, or in addition to, an objection to the adequacy of the Disclosure Statement, QCBT reserves its right to assert such objections, as well as any other objections, to confirmation of the Plan. Furthermore, to the extent QCBT is impacted in any way by the contents of any supplements or amendments to the Disclosure Statement or the Plan, which may be filed after any Disclosure Statement or Plan confirmation objection deadline, QCBT reserves its right to object thereto.

### I.    OBJECTIONS TO DEBTOR'S DISCLOSURE STATEMENT

The Bankruptcy Code requires approval of a written disclosure statement, which contains "adequate information," before the solicitation of votes on a reorganization plan. *See* 11 U.S.C. §1125(b). The adequate information requirement is to help creditors determine whether to accept or reject a proposed plan. "Adequate information" is defined by the Bankruptcy Code as follows:

> … information of a kind, and in sufficient detail, as far as is reasonably practicable, in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan …."

11 U.S.C. § 1125(b). Here, the Disclosure Statement does not contain sufficient information to enable a reasonable person to make an "informed judgment about the plan." The Disclosure Statement is misleading for several reasons. First, the Disclosure Statement does not include the proper interest rate when calculating Plan payments to QCBT. It also does not use a market term of repayment for secured commercial real estate loans. The Disclosure Statement characterizes the QCBT Promissory Notes as not being cross-collateralized. This is incorrect. The QCBT Promissory Notes are cross-collateralized and are fully secured. Further, the Disclosure Statement uses inaccurate values to calculate the allowed amount of QCBT's secured claims. The use of this inaccurate information significantly underestimates Plan payments and renders the Disclosure Statement unreliable. Finally, the Disclosure Statement does not address how certain unsecured claims will affect the Plan.

**A.    THE DISCLOSURE STATEMENT USES THE WRONG INTEREST RATE AND TERM IN CALCULATING PLAN PAYMENTS TO QCBT.**

In the Disclosure Statement, the Debtor proposes to pay QCBT (and all other secured creditors) below market interest. The Disclosure Statement proposes to pay QCBT a note rate of 4.25 percent over 10 years. QCBT has not agreed to this interest rate. This interest rate is

insufficient to compensate QCBT for the risk of non-payment. The formula approach adopted by the United States Supreme Court in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004) is most commonly used in Chapter 11 cases. *See, e.g.*, *In re GAC Storage Lansing, LLC*, 485 B.R. 174, 192 (Bankr. N.D. Ill. 2013); *In re K & K Holdings, LLC*, 2014 WL 585953 at *14 (Bankr. N.D. Ill. 2014). In *GAC*, the court summarized this approach:

> [T]he Supreme Court opined on the correct approach for selecting an appropriate rate of interest for cramdown in a Chapter 13 context. There, the plurality concluded that a "prime plus" formula rate approach, which is based upon the prime rate of interest, best carries out Congress's intent for the Bankruptcy Code provisions requiring discounting to present value. Speaking for the plurality, Justice Stevens opined that "[t]he 'prime plus' rate of interest depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor." While declining to decide the scale for risk adjustment, the Court noted that other courts generally approved adjustments of 1–3%. The Court went on to note that the cramdown requirement "obligates the court to select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan. If the court determines that the likelihood of default is so high as to necessitate an "eye-popping" interest rate, the plan probably should not be confirmed."

*Id.* As of July 5, 2019, the prime rate is 5.5 percent. *See* www.bankrate.com/rates/interest-rates/wall-street-prime-rate.aspx. For the Disclosure Statement to fairly represent the financial outlook of the Debtor, the interest rate needs to be the prime rate of 5.5 percent plus a risk adjustment of at least 2 percent.

In determining the appropriate risk adjustment, *Till* indicates that "[t]he appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Till*, 541 U.S. 479. Adjustments of 1 to 3 percent are typical in Chapter 11 cram down situations. *See K & K*, 2014 WL 585953 at *15 (citing *In re J.C. Householder Land Trust # 1*, 501 B.R. 441 (Bankr. M.D. Fla. 2013) (1.75% risk adjustment appropriate where debtor had excellent payment history, substantial equity cushion, five year loan term followed by balloon payment, 25 year amortization,

many years of management experience by the principal, pro forma based on current rental numbers and expenses); *In re LMR, LLC,* 496 B.R. 410 (Bankr. W.D. Tex. 2013) (risk adjustment of no more than 2.75% appropriate where hotel was well-managed, recent revenues exceeded projections, property was appreciating but in average condition, debtor had cash to make upgrades and improvements during the life of the plan (including from an infusion of equity), the plan was tight but feasible, and the hotel market and economy were rising); *In re GAC Storage El Monte, LLC,* 489 B.R. 747 (Bankr. N.D. Ill. 2013) (Cox, J.) (premium of 5.35% appropriate to reflect risk of depressed rental and occupancy rates due to property's location, interest rate risk for 7 year term, and lack of equity cushion); *In re Greenwood Point, LP,* 445 B.R. 885, 918–919 (Bankr. S.D. Ind. 2011) (3% risk adjustment appropriate where debt was fully collateralized, debtor's projections were conservative, reserves were maintained to attract additional tenants and maintain the collateral, and the property was likely to appreciate); *In re American Trailer and Storage, Inc.,* 419 B.R. 412 (Bankr. W.D. Mo. 2009) (2.25% risk adjustment was appropriate where projections were realistic and had historical support, and substantial equity cushion existed, but five year term, modifications to loan documents and balloon payment added risk); *In re Northwest Timberline Enterprises, Inc.,* 348 B.R. 412, 434 (5.75% risk adjustment was appropriate when secured creditor would be subordinated to taxing authorities and new lender, and plan provided for 25 year amortization with a 7 year balloon); *In re Prussia Associates*, 322 B.R. 572, 591–92 (Bankr. E.D. Pa. 2005) (risk adjustment of 1.5% appropriate where debtor's operations were improving and the value of the collateral was appreciating steadily)).

Here, the Court must add at least a 2 percent risk adjustment to account for the increased risk that QCBT faces during the term of the Plan. This adjustment is appropriate based on the following factors, which are not exclusive:

- The Debtor has a history of mismanagement and misrepresentations, and the same individuals will be managing the properties during the Plan.

- The loan-to-value ratio is very high.

- Plan is for a 10 year term (very long), amortized over 20 years (also very long).

- Plan calls for a balloon payment or refinancing, both of which are speculative.

- Plan assumes full occupancy or nearly full occupancy during the term of the Plan, which is unrealistic.

- A $2 million unsecured claim has been filed against the Debtor, which if realized could significantly impact the feasibility of the Plan.

The interest rate in the Disclosure Statement as to all secured creditors is too low and does not comport with the law. The appropriate interest rate is between 7.5 percent and 8.5 percent. None of the secured creditors (with the exception of Sauk Valley Bank) have agreed to the low interest rates rendering the Disclosure Statement misleading. Additionally, the proposed repayment term to QCBT under the Plan is not a market term. A five-year term with a balloon payment (as opposed to a ten-year term) is the market for a secured commercial real estate loan. The failure of the Disclosure Statement to utilize a market rate of interest and a market loan term renders the Disclosure Statement misleading. If market rates of interest are used, the projections in the Disclosure Statement do not accurately reflect the Debtor's repayment obligations to the creditors and make it impossible for creditors to determine whether to vote for or against the Plan and, therefore, does not meet the requirements of adequate information under § 1125(a)(1).

**B.    THE DISCLOSURE STATEMENT'S PROJECTIONS ARE NOT ADEQUATE BECAUSE THEY ARE LIMITED TO FIVE YEARS WHERE THE PLAN PROPOSES A TEN YEAR REPAYMENT.**

Although there is no prohibition on a long-term plan payment, the longer the term the more doubtful the projections. *See In re Mayslake Village-Plainfield Campus, Inc.*, 441 B.R. 309, 317 (Bankr. N.D. Ill. 2010). Here, the Disclosure Statement proposes 10-year repayments, but the

projections in the Disclosure Statement only extend out for five years, which reflects the extreme difficulty of making projections so far into the future. The length of the repayment is also problematic. QCBT needs to see full projections extending to the end of the repayment term at the appropriate rates of interest to be able to make an informed decision about the Plan.

C.   **THE DISCLOSURE STATEMENT INCORRECTLY IDENTIFIES THE QCBT PROMISSORY NOTES AS NOT BEING CROSS-COLLATERALIZED AND RELIES ON INACCURATE APPRAISAL VALUES TO CALCULATE THE ALLOWED AMOUNT OF QCBT'S SECURED CLAIM.**

The Disclosure Statement characterizes QCBT's Promissory Notes as not being cross-collateralized. This is incorrect. Each of the QCBT mortgages contains a future advance clause and in addition to each referenced note secures "all future amounts Lender in its discretion may loan to Grantor, together with all interest thereon." Additionally, the mortgages secure the "(A) Indebtedness and (B) performance of any and all obligations under the Note, the Related Documents", and "Indebtedness" includes "all principal, interest, and other amounts ... payable under the Note or Related Documents ...." "Related Documents" include "all promissory notes, credit agreements, loan agreements, environmental agreements [etc.] ... whether now due or hereafter existing ...."

Here, the Debtor surrendered the QCBT Released Property and the Loan No. 9895 Released Property to QCBT. In the Disclosure Statement, the Debtor uses old and inaccurate appraisals in an attempt to cram down the amount of QCBT's Secured Claim. Further, the Disclosure Statement purports to release the Debtor from any deficiency claim on the QCBT Released Properties and the Loan No. 9895 Released Property, even though the state court foreclosures provide for a deficiency. This results in QCBT's Secured Claim being understated. QCBT's Secured Claim should be calculated using the amounts owed on the QCBT Promissory Notes plus any deficiency on the QCBT Released Property and the Loan No. 9895 Released

Property. The appraised values of the QCBT Released Property and the Loan No. 9895 Released Property are irrelevant. The total amount of QCBT's Secured Claim in the Disclosure Statement is understated rendering the Plan payment projections unreliable.

**D.    THE DISCLOSURE STATEMENT PROVIDES NO INFORMATION ABOUT THE PROPOSED TREATMENT OF CONTESTED UNSECURED CLAIMS, SPECIFICALLY THE CLASS 17 CLAIM OF THE I-80 BANKRUPTCY ESTATE.**

Debtor estimates the amount of the I-80 estate claim to be $1.5 to $2 million, yet no information is provided about any estimation procedures. The Disclosure Statement provides no information about the basis for contesting this claim, the prospects for success or the impact on the feasibility of its Plan if its objections are overruled. Without more information on this claim, QCBT cannot make an informed judgment about the Plan. Additionally, in the event the Debtor's objections to this claim are overruled, there is an absolute priority problem that is not addressed in the Disclosure Statement or the Plan. The Court cannot approve the Disclosure Statement if the underlying plan is clearly not confirmable on its face because of its failure to satisfy the absolute priority rule with regard to unsecured creditors under § 1129(b)(2)(ii). The Disclosure Statement provides no information whatsoever as to how the Debtor would satisfy the absolute priority issue with respect to the unsecured claims.

**E.    THE DISCLOSURE STATEMENT DOES NOT EXPLAIN HOW THE DEBTOR WILL FUND CAPITAL EXPENSES.**

The Disclosure Statement provides projections for common maintenance and repairs estimated at 0.65 percent of the appraised values annually, with a three percent annual increase. However, the Disclosure Statement does not show any reserve for capital expenses that are sure to arise. Thus, the Disclosure Statement does not account for things such as new roofs, HVAC units, water heaters and the like. Without a reserve for capital expenses, the Disclosure Statement does not provide adequate information regarding the Plan.

II.     **OBJECTIONS TO DEBTOR'S PLAN OF REORGANIZATION**

Most courts have ruled that disclosure statement hearings do not include objections to plan conformation. However, where the underlying plan is not confirmable on its face, objections to the plan may be considered with the objections to the disclosure statement. *See In re American Capital Equipment LLC*, 688 Fed.3d 145, 155 (3rd Cir. 2012) (holding that a bankruptcy court may address the issue of plan confirmation where it is obvious that the disclosure statement stage that a confirmation hearing will be futile if the plan is unconfirmable).

A.    **THE PLAN DOES NOT COMPLY WITH 11 U.S.C. § 1129(a).**

11 U.S.C. § 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 Plan. *See In re 203 N. LaSalle St.* Partnership, 126 F.3d 955, 960 (7th Cir.1997), *rev'd on other grounds,* 526 U.S. 434, 119 S. Ct. 1411, 143 L.Ed.2d 607 (1999). That section provides in part as follows:

> (a) the court shall confirm a plan only if all of the following requirements are met:
>
> (1) The plan complies with the applicable provisions of this title.
>
> (2) The proponent of the plan complies with the applicable provisions of this title.
>
> (3) The plan has been proposed in good faith and not by any means forbidden by law.

11 U.S.C. § 1129(a). Here, the Plan fails to comply with § 1129(a) in several respects. First, the Plan proposes to pay QCBT less than the full amount of its Secured Claim. Second, the Plan includes an improper third party non-debtor injunction. Third, the Plan appears to contemplate further liquidation or reorganization following the term of the Plan.

1.    **The Plan Does Not Comply with 11 U.S.C. § 506(a)(1) Because the Plan Proposes to Pay QCBT Less Than the Full Amount of QCBT's Secured Claim.**

Under the Plan, the Debtor proposes to pay QCBT $3,029,347.37. However, this amount is less than what is owed to QCBT and less than the value of the collateral securing the claim. The difference in the amounts arises from a credit that the Debtor is applying against QCBT's Secured Claim. The credit is based on appraised values of the QCBT Released Property and the Loan No. 9895 Released Property. However, the QCBT Released Property and the Loan No. 9895 Released Property were sold in a foreclosure sale, leaving a deficiency against the Debtor. The Debtor's Plan improperly proposes to release the Debtor from the deficiency claims and to hold QCBT liable for excess proceeds, resulting in QCBT receiving less than the full amount of its Secured Claim in violation of § 506. The amounts bid at the foreclosure sale, not the appraised values, should be the basis for any credit to the Debtor on QCBT's Secured Claim.

2. **The Plan Does Not Comply with 11 U.S.C. § 1129(a)(1) Because It Improperly Includes an Injunction Against Non-Debtor Third Parties.**

The Debtor proposes to protect non-debtor officers, directors, principals, managers, equity interest holders and/or owners from any liability to QCBT through a permanent injunction during the pendency of the Plan. Extending releases and injunctions to non-debtors, without more, is contrary to generally-accepted bankruptcy practice. *See In re Kimball Hill, Inc.*, 591 B.R. 313, 324-25 (Bankr. N.D. Ill. 2018) ("The Seventh Circuit has 'preached caution' in approving non-debtor releases, finding that '[i]n most instances, [non-debtor] releases ... will not pass muster under [the *Airadigm* ] rule.") (*quoting Ingersoll*, 562 F.3d at 864-65 (7th Cir. 2009). Injunctions must be narrowly tailored and essential to reorganization. *See In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 657 (7th Cir. 2008). An injunction restraining creditors from proceeding against non-debtors is appropriate only where "the creditor actions would interfere with, deplete or adversely affect property of debtor's estate or which would frustrate the statutory scheme embodied in

Chapter 11 or diminish a debtor's ability to formulate a plan of reorganization." *In Re Gander Partners, LLC*, 432 B.R. 781, 788 (Bankr. N.D. Ill. 2010).

Here, the Plan's provision enjoining creditors from proceeding with claims against non-debtor officers, directors, principals, managers, equity interest holders and/or owners for co-liability or under guarantees is too broad. The Debtor has surrendered several properties to QCBT. After selling some of these properties there remains a secured deficiency judgment, which the Debtor's Plan proposes to exclude. QCBT should, therefore, be allowed to proceed against any and all guarantors to recover the deficiency. QCBT would seek to satisfy such claims with property of the individual guarantors, not property of the estate. In such circumstances, allowing such claims to proceed would not diminish the Debtor's ability to formulate and carry out a plan of reorganization.

3. **The Plan Fails to Meet the Feasibility Standard of 11 U.S.C. 1129(a)(11) Because the Debtor Has Failed to Demonstrate Its Ability to Make Plan Payments Without Further Liquidation or Reorganization.**

Section 1129)(a)(11) requires that confirmation of the plan is not likely to be followed by the liquidation or further reorganization of the debtor. 11 U.S.C § 1129(a)(11). Section 1129(a)(11) ensures that a plan of reorganization is feasible. *See In re GAC Storage El Monte, LLC*, 489 B.R. 747, 755 (Bankr. N.D. Ill. 2013). According to one court:

> The feasibility requirement mandates that the plan proponent offer concrete evidence of sufficient cash flow to fund and maintain both its operations and its obligations under the plan. In determining feasibility, a plan proponent is not required to show that the plan is guaranteed to succeed. Rather, a reasonable assurance of commercial viability is required. In making this determination, the court may examine: (i) the adequacy of the capital structure; (ii) the earning power of the business; (iii) economic conditions; (iv) the ability of the management; (v) the probability of the continuation of the same management and (vi) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*Id.* (internal quotations and citations omitted). A plan may fail to meet the feasibility requirement where the plan fails to establish that the debtor will be able to pay the creditor at the conclusion of the plan. *Id.* Specifically, when a plan proposes a balloon payment, the debtor is required to present credible evidence that the balloon payment will be made. *Id.*

Here, the Debtor's Plan proposes to consolidate the QCBT Promissory Notes and make monthly payments of principal and interest of $18,758.76 over a ten-year period (amortized over twenty years) until July 1, 2029 (the "Maturity Date"). On the Maturity Date, the Plan proposes to either (1) make a balloon payment to QCBT in the amount of $1,843,469.05 or (2) refinance the Consolidated QCBT Promissory Note. In total, the Debtor is proposing to make balloon payments to secured lenders on the Maturity Date in the total amount of $6,454,503. Thus, the only way for Debtor to make the balloon payment is to refinance the debt or liquidate additional properties. The Plan does not adequately address the feasibility of these options.

**B.    THE PLAN FAILS TO MEET THE CRAM DOWN REQUIREMENTS OF 11 U.S.C. § 1129(b).**

A plan may be confirmed over a creditor's objection if the plan does not discriminate unfairly between impaired classes and is fair and equitable to the class of creditors objecting to the plan. *See* 11 U.S.C. § 1129(b)(1). Where the plan allows the debtor to retain the creditor's collateral, (1) the plan must provide that the creditor retain its lien on the collateral, and (2) the creditor must receive deferred cash payments equal to the present value of the allowed claim. *See* 11 U.S.C. § 1129(b)(2)(A).

    **1.    The Plan Is Not Fair and Equitable Because It Proposes an Interest Rate that Is Insufficient to Account for the Risk of Non-Payment.**

QCBT believes that the proposed interest rate of 4.25 percent is inconsistent with cram down interest rates applied in the Chapter 11 context. QCBT hereby incorporates its arguments from Section I.A above.

2. **The Plan Is Not Fair and Equitable Because It Proposes a Repayment Term That Is Inconsistent with Secured Commercial Real Estate Loans in the Relevant Market.**

QCBT objects to the ten-year proposed payment term. In the relevant market, a secured commercial real estate loan should be repaid over a maximum of five years with a balloon payment.

### III. CONCLUSION

The Disclosure Statement cannot be approved. The Disclosure Statement misstates the interest rate and QCBT's Secured Claim. QCBT believes that the claims of other secured creditors have been similarly misstated. These misstatements render the Disclosure Statement's financial projections unreliable. The Disclosure Statement is also inadequate with respect to contested claims and capital expenses. QCBT cannot make an informed decision to accept or reject the Plan without accurate and reasonable projections. Additionally, the Plan should not be confirmed. The Plan does not pay QCBT the full amount of its Secured Claim, contains an impermissible non-debtor injunction and does not appear feasible without further liquidation or reorganization.

Respectfully submitted,

*/s/ Brett R. Marshall*
Brett R. Marshall
Lane & Waterman LLP
220 N. Main Street, Suite 600
Davenport, IA 52801
Phone: 563-324-3246
Fax: 563-324-1616
Email: bmarshall@l-wlaw.com

ATTORNEYS FOR QUAD CITY
BANK & TRUST

CERTIFICATE OF SERVICE

This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing.

*/s/ Brett R. Marshall*
Brett R. Marshall